Filed 9/22/21  P. v. Zuniga CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060145 |
| v. | (Super. Ct. No. SS160920A) |
| EDGAR VAZQUEZ ZUNIGA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Monterey County, Andrew G. Liu, Judge.  Reversed and remanded.

Kelley Fleming, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Stephanie A. Mitchell, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Edgar Vazquez Zuniga of committing a lewd act upon Jane Doe, a child under the age of 14 years. (Pen. Code, § 288, subd. (a).)[1] His sole contention on appeal is that the court committed prejudicial error by admitting into evidence statements he made during a police interrogation. He contends these statements were involuntary because they were the result of coercive police tactics and their admission violated his Fifth Amendment right against self-incrimination and his Fourteenth Amendment right to due process. We agree.

The police interrogation of Zuniga took place in three segments. During the first two segments, Zuniga maintained his innocence and did not waiver from his unequivocal denial of the accusation. All the while, the officers told him they did not believe him and made coercive statements, telling Zuniga that if he confessed and apologized: his charge might be reduced to a misdemeanor; he could get out on bail; he could receive minimal or no time in custody; he could be granted probation; and he could continue working and providing for his family. They also told him that if he stuck with his story, his face would be "plastered" on social media and the news in relation to the case and he would do several years or the maximum sentence in custody. After making these statements, the officers placed Zuniga in a holding cell for an hour. When they told Zuniga they were taking him to county jail, his will was overborne and he began to capitulate. At the beginning of the interview's third segment, Zuniga started trying to give the officers what he thought they wanted. He admitted there was a possibility that what Jane Doe said was true, but he did not remember it because he was intoxicated. When the officers were not satisfied with this and told him they probably could not help him with the "possibility thing" and he needed to make what he remembered "corroborate" the victim's story, Zuniga confessed by agreeing with the officer's version of the incident.

---

[1]    All further statutory references are to the Penal Code, unless otherwise indicated.

2

When the admissibility of Zuniga's statements was litigated in the trial court, the interrogating officers conceded they had made improper statements while questioning Zuniga. The trial court suppressed Zuniga's statements at the end of the third segment, in which he agreed with the officer's version of the incident. But the court ruled the rest of the interrogation was admissible, including incriminating statements Zuniga made admitting it was possible he committed the offense. We conclude the court should have excluded all of Zuniga's statements from the interview's third segment. We further conclude the error was not harmless beyond a reasonable doubt and reverse Zuniga's conviction.

## FACTS

In 2016, Jane Doe (Jane) lived in a three-bedroom house with her Mother, Stepfather (collectively parents), and two younger sisters.[2] Jane's maternal Grandmother and Stepgrandfather (collectively grandparents) also lived in the house with their two sons, Jane's uncles. Jane's parents slept in the master bedroom; her grandparents and uncles slept in one of the bedrooms; and Jane shared a bedroom with her sisters. There were two beds in Jane's bedroom. Jane's sisters both slept in the bed by the door. Jane's bed was farther in the room, underneath a window.

Mother and Stepfather were close friends with Zuniga and his wife. Both families were part of a close group of several families that frequently got together. Jane had known Zuniga since she was five years old and saw him often.

A. *Incident at the Party*

Jane was 13 years old when her parents hosted a birthday party at their house for one of Jane's younger sisters. Zuniga, his wife, and their three young children

---

[2]     We refer to the victim as Jane and her family members by their relationship to her to comply with the court's protective nondisclosure policy concerning victims in criminal proceedings. (§ 293.5; Cal. Rules of Court, rule 8.90(b)(4).)

attended the party, as well as several other couples and their children. The party began in the afternoon and lasted until the early morning hours of the following day.

Sometime between 11:00 p.m. and midnight, Zuniga's wife decided she wanted to leave the party and go home. Zuniga, however, wanted to stay, as did one of their sons. Zuniga walked out with his wife and helped her put two of their children in the car. Zuniga then returned to the party. Before leaving, Zuniga's wife changed her mind about letting their son stay. She went back inside, grabbed the child from the living room, exclaimed she was taking him with her, and left. She did not tell Zuniga, who was in the backyard at the time, that she was taking their son.

Jane went to bed around midnight. About 1:35 a.m., she woke up when she felt someone grabbing her breast. The person's hand continued downward, touching her stomach over her clothes, rubbing and fingering her vaginal area through the leggings she was wearing, and then sliding down her leg. It was dark in her bedroom, and Jane could not see who was touching her. When she pretended to wake up, the touching stopped. As the person walked into the lit hallway, Jane realized it was Zuniga.

Using her tablet, Jane tried sending an electronic message to her uncle in the next bedroom, pleading with him to wake up her grandmother and come help her. But her message did not go through because the Wi-Fi was off. Once Jane realized this, she started banging on the wall between her room and her grandparents' bedroom. When there was no response, Jane went into her grandparents' bedroom. She was scared and crying. She told them Zuniga had come into her room and touched her breasts and vagina.

Stepgrandfather left the bedroom to talk to Jane's parents. He told Stepfather what happened and then returned to the bedroom. Stepfather privately spoke to Zuniga about Jane's accusation, and Zuniga denied it.

About two hours later, Stepgrandfather decided Zuniga should leave and he drove Zuniga home. During the drive, Stepgrandfather confronted Zuniga about Jane's

4

accusation.  At first, Zuniga denied entering Jane's room but then he explained he had gone into her room looking for one of his sons.  Zuniga denied doing anything improper.

After Zuniga left, Jane told Mother what had happened.  Later that day, Jane's aunt called the police.  Officers Froylan Aranda and Daniel Garcia responded to the call and spoke to Jane.  At the time, Aranda had been a police officer for less than a month and Garcia was his field training officer.

## B.  *Zuniga's Arrest and Interrogation*

After talking to Jane, Aranda and Garcia went to Zuniga's house and arrested him around 6:00 or 6:30 p.m.  They took him to the police station, where Zuniga was first placed in a holding cell before being moved to an interrogation room for questioning.[3]

### 1.  *First Segment of the Interview*

The interview's first segment began a few minutes before 7:00 p.m. with Aranda advising Zuniga of his *Miranda*[4] rights.  Zuniga indicated he understood his rights and implicitly waived them as he invoked neither his right to remain silent nor his right to counsel.  (See *People v. Cruz* (2008) 44 Cal.4th 636, 667 ["A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights" constitutes an implied waiver of those rights].)

In response to questioning by Aranda, Zuniga stated he was good friends with Jane's stepfather and had known Jane for seven or eight years.  He attended a party

---

[3]      In the trial court, the court and the parties characterized the interview as occurring in three segments.  For the sake of consistency and to avoid confusion, we adopt the same characterization.

We discuss each segment in detail.  Quotations are from the transcript of the interview provided to the trial court and include indicated pauses, as well as grammatical and typographical in the quoted material.  We italicize several statements by the officers relevant to our analysis of Zuniga's appellate claim.

[4]      *Miranda v. Arizona* (1966) 384 U.S. 436.

at their home the day before with his wife and children. When asked to describe what happened at the party, Zuniga recounted his wife left around midnight with two of their children but told him she was leaving one of their sons there with him. Zuniga continued drinking with others at the party. Eventually, he went to the restroom and then decided to check on his son because he was considering leaving soon. He first looked for his son in the master bedroom. Zuniga saw Stepfather and told him that he was searching for his son. Stepfather told Zuniga that his son was in Jane's room and pointed to her room.

Zuniga went into the room and found it to be completely dark. There were two beds in the room. He kneeled onto the bed farthest from the door, "tapped" the bed with his hand, and called out to his son. He felt Jane on the bed and tapped the other side of the bed to see if his son was there, but it was empty. He left the room. In the hallway, he saw Stepfather again and they returned to the party and drinking.

At some point, Stepfather privately spoke to Zuniga and told him that Jane was crying and saying that Zuniga touched her inappropriately. Zuniga denied it, exclaimed he would never do that, and explained he was looking for his son. Stepfather believed him but indicated Jane was pretty upset. Zuniga thought he might have startled Jane. Zuniga returned to the party and stayed until everyone left.

Later that day, Zuniga called Stepfather to talk and make sure everything was okay. When Stepfather did not answer, Zuniga went to Jane's house to talk to Stepfather and Mother. Stepfather told Zuniga that he was "with" him but Mother did not believe his story and was going to call the police. Zuniga indicated his understanding and willingness to cooperate and talk to the police. He offered to stay at their house until the police arrived, but Stepfather told him to go home.

Aranda questioned Zuniga about how much he had to drink at the party, and Zuniga responded he had about 10 beers over six or eight hours. Aranda suggested drinking that much alcohol can get someone "pretty drunk," to the point they are "unaware of much of their actions."

6

Zuniga reiterated his version of what happened in Jane's room. Aranda informed Zuniga they had talked to Jane and she had provided them a different version. Aranda returned to how much Zuniga had to drink that night and doubted he personally would be able to "handle [10] beers."

Garcia took the lead in interviewing Zuniga. He explained Jane was very detailed in her description of what happened and her reaction was consistent with it being a traumatic event. Garcia remarked people "tend to make bad mistakes" when they drink. Garcia informed Zuniga that Jane's sweatpants were being tested for DNA and Zuniga's DNA would be present on Jane's clothes if Zuniga did the things she described.[5] He warned Zuniga it would be worse for him if his DNA was found on Jane's clothes, and he urged Zuniga to tell them the truth so that it would not be as bad when he goes to court. Garcia told Zuniga Jane was traumatized and that when she heard him at the house that morning, she got scared, ran outside, and was crying and shaking.

Garcia asked Zuniga why Jane would lie about what happened. In response, Zuniga suggested she was asleep and may have only thought he did something because she woke up with him in the room and felt his hand touch her. Zuniga indicated he understood that Jane might have been startled and frightened because she woke up to find him in her bedroom and he had never before been in her bedroom. When Garcia pressed Zuniga to explain why Jane would lie, Zuniga said he did not know, but nevertheless, he tried to offer an explanation based on past abuse in Jane's family.

Garcia again suggested people make mistakes when they drink and told Zuniga that he was "just trying to help [him] out." He advised Zuniga that if his DNA was found on Jane's pants, Zuniga would have to explain it to the judge and the judge would probably add another charge.

---

[5] This appears to have been a ruse as Jane's clothing was not collected for DNA testing.

7

When Garcia mistakenly said that Zuniga had indicated he tapped Jane on the shoulder, Zuniga disagreed.  Zuniga clarified he tapped the middle of the bed and therefore might have touched her mid or lower section.  Garcia accused Zuniga of changing his story and warned him that he was making himself look bad.  Zuniga admitted it looked bad and explained that was why he went to talk to Jane's family that morning and wanted to cooperate with the police.

Garcia indicated he would give Zuniga a couple of minutes to decide if he wanted "to stick to that story," while Garcia talked to his sergeant.  Garcia told Zuniga if he told them what really happened and wrote an apology letter, it would help Zuniga.  He informed Zuniga that he was facing only one charge, not multiple counts.  Garcia then stated:  "*And the big difference from the incident we're investigating now for being one incident because we made a bad decision and we've been drinking and it's plain, simple and it's done with already.  Okay? . . . I mean, to be honest with you, you could bail out if you wanted to . . . tonight if you wanted to, but that's if we do decide to take you to jail or not, okay*?  All right?  So I'll give you a couple minutes to think about it. We'll be back."  The officers left Zunia alone in the interrogation room for approximately 10 minutes before the interview's second segment began.

2.  *Second Segment of the Interview*

When the officers returned, Garcia informed Zuniga he had just spoken to Stepfather on the telephone, who denied telling Zuniga to look for his son in Jane's room.  Zuniga maintained he spoke to Stepfather before going into the bedroom.  He reiterated that when he spoke to Stepfather after Jane made the allegation, Stepfather believed Zuniga's explanation and indicated everything was okay.

Garcia did not believe Zuniga's story.  Garcia indicated he felt for Jane and believed something traumatic happened to her to cause her to be so traumatized and frightened of Zuniga.  Garcia advised Zuniga his story would "look stupid in court" and said he was trying to help Zuniga.  When Zuniga maintained his version of what

8

happened, Garcia urged Zuniga to "tell [them] right now what really happened" because doing so would "help" Zuniga. Garcia stressed Zuniga was only facing one charge, not multiple counts. Garcia then returned to the DNA ruse, telling Zuniga "professionals" would examine Jane's pants "and if . . . if they do find your DNA, then you're pretty much gonna do the max time that that charge carries, okay?" Garcia said in contrast, if Zuniga said he was sorry, admitted he made a mistake, and wrote an apology letter, Zuniga could: "*move on . . . and . . . probably do way, way, way less time than that. You can bail out . . . you could be out on bail and never see jail time, okay?*" Garcia reiterated Zuniga was facing only one charge, not multiple counts. He told Zuniga the charge was a felony but it "*could be dropped down to a misdemeanor if*" Zuniga admitted he made a mistake and apologized, given his lack of record.

In response, Zuniga indicated he understood the officers were trying to help him but he had already told them what he remembered happening. He continued: "And like you said, I had a few, you know, blend of beers to, I guess, be on the drunk side.

Garcia again indicated he did not believe Zuniga. Garcia stated it was inconceivable Jane would be so frightened and traumatized if all Zuniga did was accidentally wake her up. He continued to press Zuniga, telling him: "I understand you have a family and you have kids and you have a household to run and stuff like that. *But that DNA to come back [on] those pants, I mean, you're gonna be in a lot of trouble. I mean, you can tell your family you won't see them for a couple years. And then now you're gonna leave your family to struggle and to have them pretty much . . . Oh, I'm gonna say your . . . your wife . . . to run that household and . . . and do what she needs to do to cover your house. So think about that as well, okay?* And if you think I'm lying to you, I'm . . . I'm not lying to you. It goes better off if you tell the truth than to . . . we find out what really did happen."

Going through the incident again, Zuniga maintained his version. As Zuniga had not changed his story, Garcia indicated they were "done" talking but asked if

9

Zuniga had any questions. Zuniga inquired what he was being charged with, and Garcia responded it was one count of child molesting. Garcia told Zuniga that if his DNA was found on Jane's pants, he would "do the max time . . . and that's several years" and would have to annually register as a sex offender.

Aranda warned Zuniga that if he stuck with his story and the "evidence technicians come back with your fingerprints all over the pants, it's gonna caught up . . . get caught up in the media. Your face might show up in the, Face . . . in Facebook and stuff." Aranda urged Zuniga to be straight with them and "*tell [them] what really happened. You were drunk.*" Aranda continued: "I know it happened. He knows it happened. You know it happened. *All you've gotta do is be straight up with us. Tell us what actually happened, all right? Do you want your face all over the media?*" Aranda told Zuniga if he stuck with his story and they found out the truth: "*Something's gonna come out, and your face is gonna be plastered . . . plastered all over the media. People are gonna find out. So if you don't want anybody to find out, talk to your wife, tell her what really happened, you can move on. It's one count, as he said. You have nothing in the past. The judge is gonna see that. It's gonna come into record that you were drinking, you have nothing in your past. Ten beers, that's a lot of beers. I'm not . . . in ten beers, I'm not consciously there.*"

Aranda suggested Zuniga may have been looking for his son but then saw Jane in the bed and because he had been drinking "touched [her] a bit more than [he] had to." He urged Zuniga to "be straight up" with them and stated, "*We can work this out.*" As Zuniga again began to deny the accusation, Aranda interrupted him and told Zuniga: "It's only one charge, as we said. Just be straight up with us. You have a conscience . . . ." Garcia suggested it was a mistake if it happened, but Zuniga continued to deny anything happened.

Garcia told Zuniga when they compared Jane's story with his, Jane's version made sense and a judge would believe her story. Garcia again returned to the

possibility of DNA evidence coming back against Zuniga, warning Zuniga: "there is no reason . . . no reason why your DNA should be on her crotch area, okay? *And like I said, I would hate for you to go to jail for several years for something that you could have not just . . . put it on the table . . . and say, 'You know what? I fucked up. I'm sorry.' . . . Done with already . . . you could have just done minimal time. I mean, even . . . not even go to jail. You can stay out on probation . . . be on probation and be out on bail, and not get in trouble and still provide for your family and work and do what you have to do, okay?* But like I said, I . . . I . . . I'm done. And I'm pretty sure you'll never . . . ." Zuniga responded: "Yeah, I mean . . . but I mean, if you want me to tell you that, you know, when you're drinking and then you sometimes lose control . . . ." Garcia indicated that drinking was a factor.

Garcia repeated he was "done" talking to Zuniga and they would run "it" by their supervisor and "see what happens." He made one last appeal for Zuniga to tell them what happened because if Zuniga's DNA came back on Jane's pants, everything was going to "blow up" in his face. When Zuniga maintained his innocence. Aranda took Zuniga back to the holding cell while Garcia talked to their sergeant.

Zuniga remained in the holding cell for about an hour. When Aranda went to the holding cell and told Zuniga they were going to take him to county jail, Zuniga said he wanted to give another statement. The officers took Zuniga back to the interrogation room, and the interview's third segment commenced.

3. *Third Segment of the Interview*

Garcia asked Zuniga to confirm he was not being forced to make a statement and not promised anything; Zuniga answered, "***You didn't force me to***."[6] Garcia then urged Zuniga to tell them "what really happened," and Zuniga responded: "***So what I've told you so far is exactly the recollection I have***" "***from that night. Um,***

---

[6]     Statements admitted at trial are indicated in boldface and italics.

11

*however, while sitting in the cell right now, and I did think about the many times that I've consumed alcohol in excess and felt like, yes, you can do things that you might forget. Um, it's hard to admit to something that you do not have a recollection of, but obviously, the possibility that it happened is . . . it's there*." "It exists because . . . you know, happen . . . the situation. So I . . . I mean, I don't know how to word it, but I . . . it's hard to admit something that you don't recall."

When Zuniga was not forthcoming with anything new, Garcia reminded him that he wanted to talk to them again and suggested Zuniga was "on the border of" telling them "what really happened." The following exchange then occurred:

"[Zuniga]: Well, honestly that's what I recall.

"[Garcia]: *Well, you said there's a possibility [what] . . . she said did happen.*

"[Zuniga]: *Well . . .*

"[Garcia]: *What . . . what . . . what do you remember from that?*

"[Zuniga]: *I . . .*

"[Garcia]: *I mean, is it a possibility?*

"[Zuniga]: *I remember . . . I remember the same thing that I told you that I . . . went and tapped and . . .*

"[Garcia]: *So you're not telling me anything different then?*

"[Zuniga]: *Well, I'm telling you that the possibility does exist cause, you know, when you're intoxicated and . . . I mean, I've done things that I . . . I remember people telling me, 'You kissed this girl. You did this. You did that.'*

"[Garcia]: *So what you're telling me is that since you were intoxicated, whatever Jane Doe told us is a possibility that happened, but a mistake on your part because of the alcohol?*

"[Zuniga]: *Yes.*

12

"[Garcia]: *Okay. So, I mean, it's pretty much there. And . . . and I think you do want to tell me exactly what happened, but you're just kind of like . . . .*

"[Zuniga]: *Well, like I said, officer, I . . . I mean, it's hard to admit to something that you don't recall. I mean, I . . . I'm not proud to say it, but, I mean, I have abused alcohol for the last . . . .*

[¶] . . . [¶]

"[Zuniga]: *20 years maybe. . . .*

[¶] . . . [¶]

"[Zuniga]: *But, um, you know, from thinking there . . . and just thinking of the many times I've done stupid things that you don't remember, you don't all. . . . All . . . you know is . . . [w]hat people tell you, and that's how you know, so . . . .*"

Zuniga stated he felt "extremely bad for harming [Jane's family]." Garcia continued to question Zuniga: "*And so you pretty much put yourself there in your . . . your pretty much telling me that because of the alcohol, whatever she said happened, right?*

"[Zuniga]: *It's a fair poss- . . . it's a possibility.*

"[Garcia]: *But you don't remember it clearly?*

"[Zuniga]: *No.*"

When Garcia offered a scenario that Zuniga went into the room looking for his son but saw Jane and made "a stupid decision at the moment," Zuniga rejected it. He stated: "*I mean, whether I touched her longer than I should have, you know, when I tapped her, I mean, that's. . . . that's what . . . we're discussing that. It wasn't my intention to stay there for more than what . . . .*" *Garcia suggested Zuniga did not want to fully admit what happened and look bad. Zuniga responded he did not remember it.* He *indicated he was willing to admit he had a history of alcohol abuse and could "totally relate to doing things" while drunk that you do not remember*. The following exchange then occurred:

13

"[Garcia]: *But you do have a recollection of being in that room, right?*

"[Zuniga]: *Of course.*

"[Garcia]: *And telling me that you were that intoxicated, that whatever Jane Doe told us, that it's a good possibility it happened?*

"[Zuniga]: *Uh-huh*."

Garcia suggested Zuniga was trying to set up an intoxication defense. Garcia indicated Zuniga knew what happened and could "set stuff right" so when he went to court it would not look as bad and it would help him. Zuniga responded he was "not familiar with the court system and all that business." Zuniga expressed it was not in his best interest "to take this as far as it could go . . . ." Garcia told Zuniga: "Yeah, cause, I mean, it's a possibility if you did take it as far as it goes" "and you go to jury trial and you're gonna have 12 people" "looking at the evidence we have" "and you're . . . what you're presenting . . . ." "*Where in a court system, the way it works out . . . so you do go to jail for this, okay? And there's . . . there's no if, ands or buts out . . . about it. You do go. And if you get your attorney, they look at it, and you plead out to some deal and the, uh . . . the District Attorney's Office agrees to that deal, that's . . . that's the agreement they reach, given that, 'Okay. I messed up.' I . . . I . . . they look at your record, blah, blah, blah, okay. Uh, probation for three years. It's done with already. Stay out of trouble. Don't do it again.*"

Garcia told Zuniga a jury would not believe his story and would believe Jane. Zuniga responded: "*So, I mean, the reason I wanted to talk to you is because like I said, I . . . I'm admitting to the possibility of it happening and if it needs to get to that, you know, for them to prove me guilty, I mean, I . . . I don't want to get it that far*." "I mean, if I can . . . if I can do it now, I mean, obviously, I will serve time . . . ." Garcia remarked, "*There's a difference between you telling me 'a possibility' to 'Yes, I did it*.'" Zuniga replied: "*Because I don't . . . I don't recall it. I don't . . . I mean, that's . . . that's different*."

14

Garcia said he believed Zuniga did recall what happened. He told Zuniga he was not promising him anything but it would "*go better* [*for him*] *in court*" and Zuniga maybe could "*go out to some plea deal*" if he confessed. Zuniga again said it was "*hard to admit to something that*" he did not remember but "*it's obviously a possibility.*" Garcia commented Zuniga was sticking to his story that nothing happened. Garcia told Zuniga: "[A]nd I know you had time to think about it. . . . And I know you know what happened, okay? I . . . I . . . I just know it. '*Cause I knew in the beginning her story and your story did not match, and something really happened. And it's kinda . . . it's getting there, okay? But, let's . . . let's just . . . for your family and her family, it's not fair to say that it was a possibility it happened.* 'Cause in . . . in your heart, you know what happened, okay? I mean, I don't think you were that passed out drunk in order to not recollect some of it, what happened, okay? If you tell me, I'm . . . and . . . and . . . and the way it is, like if you tell me what happened, I know it sounds bad." "It's gonna look bad. But it's gonna look bad if you go against 12 people" "*where you can just handle it* [*through*] *a plea deal and it's done with already, okay?*" "*Just do whatever time they give you, whatever. If you get a good attorney, then they can give you a good* deal." "And . . . *and less charge and less time, maybe even probation, get out on bail.*"

Zuniga asked: "*Without lying, does it make a diff- . . . difference if I told you, 'Yes, I mean, there's a possibility that like I touched her.'*" Garcia responded they had gone "from 'It didn't happen'" to "'a possibility it did happen'" but "'I don't remember.'" Zuniga stated he had told them the events as he recalled them. He explained: "And then I sat down there and was thinking about the many times I've gotten that drunk . . . and yes, how you forget details and how, yeah, you could do things that . . . ."

Garcia reiterated Zuniga did not want to say he was guilty or what happened because it looked bad. He continued: "*But in the long run if you say, 'You know what? I fuckin' did it. I'm sorry. You know, I . . . I apologize. We make mistakes.*

15

*This is where you're going. 'I was drunk. I made a mistake. I'm sorry.' Because the judge is saying a possibility is not going to cut it, whether you . . . it's either you did it or not, right?*" Garcia made conflicting statements, telling Zuniga that saying it is a possibility was not good enough but also that it was the same as saying it happened. He told Zuniga his attorney "would have to work up some master plan to make [him] not guilty." In response, Zuniga stated, "I mean, I've told you exactly everything that I recall. I mean, I could use different wording maybe, but I mean that's . . . that's the best that I recall it."

Garcia again pressed Zuniga to confess: "the matter of the fact is it happened, it happened 'cause we know what the crime is. So, like I said, it did or it didn't. It . . . there's not a possibility it did." "The evidence says you did." "And you're telling me at first it didn't, but you're . . . you're working up to right here." Zuniga responded that "it's hard to admit one's guilt if you don't recall the events." Garcia did not believe Zuniga's lack of recall and told Zuniga: "*You're . . . you're doing this*" "*because you know you have to do this. You're doing this for your family's peace of mind and the victim's peace of mind, okay? In reality, she is a victim.*" "*Okay? So, like I said, um, this possibility thing, I probably can't help you with that. It's either gonna be, 'You know what? I fucked up. I did it' or you didn't do it.* That's how we work. I'm not going to take you to jail because I think you did it. I'm taking you to jail because the evidence shows it happened. Now I'm not taking you to jail because I don't like you. It doesn't work that way. That's why we bring you here. We give you your side of the story, okay?"[7]

Zuniga responded, "I mean, I'm . . . I'll . . . I'll admit to it happening then if that's what you want to hear, but . . . ." When Garcia said that was not what he wanted to hear, Zuniga stated, "Okay. Well, that's how I . . . that's the way I have to

---

[7]        As explained *post*, the court ruled Zuniga's subsequent statements were coerced and inadmissible at trial.

word in order to . . . to help myself, or to help the situation or help myself, so . . . ." Garcia replied he was not forcing Zuniga to talk to them. Garcia told Zuniga he was "not promising [him] anything, but" was telling him if he did "cooperate with the investigation" to make what he remembered "corroborate [Jane's] story" then that could be sent to the court and it would not look as bad for Zuniga. Zuniga confessed by agreeing with Garcia's statements:

"[Zuniga]: But anyways, um, obviously, I mean, I'll admit that I did it, but I . . . I cannot tell you the details or what I . . . because they're . . . they're not there.

"[Garcia]: So what . . . what you're telling me now is whatever Jane Doe told us, you're admitting to that?

"[Zuniga]: Uh-huh.

"[Garcia]: But you don't remember the details on where you touched her, right?

"[Zuniga]: Uh-uh.

"[Garcia]: But you do know . . . you do admit to . . .

"[Zuniga]: I was there.

"[Garcia]: . . . touching her?

"[Zuniga]: Yes.

"[Garcia]: In places you should not have touched her, right?

"[Zuniga]: Yes."

Garcia told Zuniga his confession would be noted in the report and his attorney could work with the prosecutor's office on a plea deal. He indicated Zuniga could take the case to trial, but Garcia would "hate for" Jane to have to testify and for Zuniga's attorney to "make her look like a liar" because that was not fair to Jane. Garcia played on the fact Zuniga was a father and would not want his daughter to testify, be cross-examined by an attorney, and called a liar. After Garcia told Zuniga they were

17

taking him to jail and he could call his wife from there, Zuniga asked if he could get out on bail as Garcia had said. Zuniga wrote an apology letter as Garcia had suggested.

## C. *Trial Proceedings*

### 1. *First Trial*

Zuniga was charged with a single count of committing a lewd act upon Jane (§ 288, subd. (a)) and was tried before a jury. During the trial, the prosecution presented testimony by Jane and her family but did not seek to admit any of Zuniga's police interview. The trial ended in a mistrial after the jury announced it was deadlocked and revealed it was evenly split.

### 2. *Second Trial*

A different prosecutor picked up the case for retrial. In an in limine motion, the prosecution indicated it intended to introduce a portion of Zuniga's police interview but did not specify which of his statements. Zuniga, in his in limine motion, argued statements he made "as a result of threats of increased punishments and promises of leniency" by the officers were "inadmissible for all purposes." In a supplemental trial brief, the prosecution asserted that despite the officers' "inappropriate questions and comments," Zuniga's will was not overcome by these tactics, and therefore, his confession was not coerced.

### a. *Pretrial Evidentiary Hearing on the Admissibility of Zuniga's Statements*

At the evidentiary hearing on the admissibility of Zuniga's statements, the prosecution submitted the video recording of Zuniga's police interview and its corresponding transcript and presented Aranda and Garcia's testimony.[8] Both Aranda and Garcia testified they had received training on proper interrogation techniques. Aranda had been trained not to promise a suspect a specific outcome in the case, indicate a felony would be reduced to a misdemeanor, or talk about bail. Similarly, Garcia had

---

[8]    We ordered the video recording transferred from the superior court to us for review.

18

been trained not to promise a suspect a minimum sentence, bail, or probation. Based on his training, Aranda knew they were not to threaten, coerce, or promise things to a suspect to get a statement.

However, both officers admitted that during their interrogation of Zuniga, they disregarded their training, engaged in improper interview techniques, and said inappropriate things in an effort to get Zuniga to confess. When asked to explain why, Aranda testified he was sympathetic to Jane and felt he needed to get a confession from Zuniga to protect her. He believed Zuniga was guilty, and he was "eager to get [Zuniga's] confession." He acknowledged that in his zeal, he "might have" made some inappropriate statements to Zuniga. Garcia likewise attributed the violation of his training and use of improper interview techniques to his belief that Jane was telling the truth. Admitting he made some promises and statements to Zuniga he should not have, Garcia explained he did so because he had "kind of [a] hunch . . . that the incident occurred" and thought he could get Zuniga to confess. Nevertheless, both officers believed they were unable to manipulate Zuniga and their efforts were unsuccessful because Zuniga never fully confessed.

1. *Argument and Court's Ruling*

Arguing for the admission of Zuniga's statements, the prosecutor acknowledged the officers made some inappropriate comments during the interrogation, but the prosecutor asserted the officers' threats and promises were "poorly done" and unsuccessful. The prosecutor contended the officers' promises did not result in an unreliable and involuntary statement because Zuniga's statements came solely from his desire to cooperate. Zuniga's counsel, on the other hand, argued the officers made both express and implied promises during the interrogation that produced involuntary statements. Defense counsel urged the court to consider the progression of the interview and how the officers' conduct impacted Zuniga, resulting in him changing his statement in the interview's third segment.

19

The court suppressed Zuniga's statements at the end of the third segment, in which Garcia laid out a confession and Zuniga agreed with it. The court concluded these statements were coerced and unreliable. But the court ruled the rest of Zuniga's statements were admissible. Providing a detailed explanation of its findings and conclusions, the court discussed its review of the interrogation's video recording and transcript and indicated it found credible the officers' testimony at the hearing.

Addressing Aranda's statements to Zuniga that his face could end up "plastered" on Facebook and in the media if he stuck with his story, the court found this statement was an improper "attempt to publicly embarrass or publicly shame" Zuniga that could have "pervasive negative consequences." The court noted that despite this statement and other statements in the interview's first two segments, Zuniga maintained his version of the event. The court indicated it began "to have concerns about the reliability and voluntariness of [Zuniga's] statement" after Garcia asked Zuniga to confirm, early in the third segment, that he was intoxicated and there was a "good possibility" that whatever Jane said happened was true.

The court concluded "the [officers'] implicit inducements that there [would] be a benefit if [Zuniga] gave a statement consistent with Jane Doe's comments," combined with the emotional pressure asserted on Zuniga given his relationship with Jane's family, "resulted in an unreliable admission" near the end of the interview's third segment. The court explained: "So when I look at the totality of all this and I see the context of it all I see a situation where the defendant was attempting to appease the officers and in particular, help Jane Doe's family by admitting to whatever it is that Jane Doe said[,] which is ultimately what he said, not entirely knowing what she said[,] it seems based on the interview as well." After further argument, the court also suppressed Zuniga's apology letter.

20

b. *The Prosecution's Case*

At trial, the prosecution presented evidence concerning the incident at the party, as detailed above, from the testimony of Jane, Mother, Grandparents, and Zuniga's wife. Aranda testified regarding Zuniga's arrest and questioning at the station. He explained that in the interview's first two segments, they allowed Zuniga to tell his version of what happened and Zuniga answered their follow-up questions. During the first two segments, Zuniga's version of what happened remained consistent and he did not say he made a mistake because of alcohol or that he was unable to recall events from that night because of alcohol.

Aranda explained that because Zuniga's story did not match Jane's, they tried different approaches to get him to admit that what Jane said was true. Aranda was trained at the police academy not to promise a suspect something to get him to talk. He did not believe he violated his training during the interview but acknowledged he "might have gotten close to the line of . . . promising something to" Zuniga.[9] During cross-examination, Zuniga's counsel highlighted statements the officers made during the interview, in which they warned Zuniga his face might be broadcast or appear on Facebook in connection with the allegation, told him that he could go to jail for several years, and implied he would not have to go to jail if he told them what they wanted to hear. Aranda admitted Garcia falsely told Zuniga the charge could be reduced to a misdemeanor. Even though they were trained not to say things to the suspect about the charges that are not true, Aranda did not believe Garcia's statement violated their training because it was qualified as a possibility. After the officers made comments to Zuniga

---

[9] Aranda's denial of violating his training was inconsistent with his prior testimony at the evidentiary hearing, where he admitted he disregarded his training and used improper interview techniques to get Zuniga to confess. When questioned about this inconsistency, Aranda essentially denied his prior admission, stating he previously testified he was close to violating his training.

eight times suggesting he made a mistake because of alcohol, Zuniga came back in the interview's third segment and said it was a possibility he made a mistake because he had been drinking.

The prosecution played for the jury 10 snippets of Zuniga's police interview. The first two snippets came from the first two segments of the interview. In these, Zuniga told the officers his version of the events, explaining he went into the bedroom to look for his son; it was dark so he tapped the bed and called out his son's name.[10] The other snippets were statements Zuniga made during the interview's third segment, in which he admitted: it was a possibility the incident happened as Jane said but he had no recollection of it because he was intoxicated; he had abused alcohol for 20 years and sometimes does not remember things he does when he is drunk; and he made a mistake because of alcohol.

c. *The Defense's Case*

In his testimony, Zuniga described his close relationship with Jane's family. Both families frequently socialized with a group of other families, and it was common for these get-togethers to be at the home of one of the families with children present and playing together. Sometimes the children would sleep somewhere in the house, a bedroom or sofa, and the adults would continue fraternizing.

Zuniga's testimony concerning the party was consistent with his statements in the first two segments of his police interview. When he entered Jane's room, he saw a small child with long hair in the bed to his left and recognized that was not his son. He saw a figure lying on another bed farther in the room, but it was very dark. Kneeling by the bed, he tapped the middle of the bed, and twice softly called out his son's name. He realized the figure was not his son but reached over the figure and ran his hand across the

---

[10] In his appeal, Zuniga does not challenge the admission of his statements in the first snippet, which he requested the trial court admit under Evidence Code section 356.

22

bed to see if his son was curled up in one of the corners. Finding that portion of the bed empty, he walked out of the room. When Stepfather confronted him about what happened in Jane's room, Zuniga explained he went into Jane's room looking for his son. Zuniga was shocked by the accusation he had improperly touched Jane and wanted to remain at the party to clear up the matter.

Zuniga was arrested later that day. He waived his *Miranda* rights because he wanted to talk to the police and tell them what happened. He explained to the officers he went into the room looking for his son, tapped the bed, and then left. He repeated this to them more than once, but they did not believe him.

The officers made statements to him suggesting alcohol may have had something to do with the incident. They told him that if he continued with his story, he would be charged with a felony and would spend several years in prison, but if he changed his story and agreed to what they were saying, the charge would probably be a misdemeanor, he would do minimal time, and could probably get out on bail that night. While he was in the holding cell, he thought about everything the officers had said to him and he weighed his options. He was at a loss and felt he could not win against them. He believed them when they said it would be better for him if he said it happened because he was intoxicated. Given the officers' statements about what would happen if he changed his story, Zuniga felt he had to give in and change his story to what they wanted. When Garcia said to him, "This is where you're going. I was drunk. I made a mistake. I'm sorry," Zuniga thought that was what Garcia wanted him to say. He tried to say what the officers wanted, but it was not true; he did not touch Jane's her breasts, legs, or vagina.

One of Zuniga's close friends, who was Stepfather's brother-in-law and part of the social group that attended the party, testified on Zuniga's behalf. He saw Zuniga's wife leave the party with two of her children and did not see her return and take their third child. It was common at events like this for the children to fall asleep in one of

the bedrooms. He had seen Zuniga interact with children on many occasions, and in his opinion, Zuniga was not disposed to lewd conduct with children.

d. *Verdict and Sentencing*

The jury convicted Zuniga of committing a lewd act on a child. The trial court suspended imposition of sentence and placed Zuniga on formal probation for six years, with a condition he serve 364 days in jail.

DISCUSSION

Zuniga argues the trial court committed prejudicial error by admitting incriminating statements he made during the police interview. Specifically, he contends the court should have suppressed his statements after Garcia told him the charge could be reduced to a misdemeanor if he confessed and apologized because statements he made subsequent to this and other promises of leniency and threats by the officers were involuntary as they were the result of police coercion. The Attorney General makes three arguments in response: (1) Zuniga forfeited his appellate claim by failing to object to the specific statements admitted at trial; (2) the trial court properly concluded Zuniga's statements were voluntary and admissible; and (3) any error was harmless. We disagree with the Attorney General on each point.

A. *Forfeiture*

The Attorney General asserts Zuniga forfeited his appellate contention because his "[t]rial counsel did not argue below that the isolated portions of the interview that were admitted at trial were involuntary, [or] argue that everything after page 41 of the transcript was inadmissible." We disagree. The record establishes Zuniga's counsel argued in the trial court that all of Zuniga's statements made "as a result of threats of increased punishments and promises of leniency" should be suppressed, and counsel identified page 41 of the transcript as one of the first instances where the officers made an improper promise of leniency to Zuniga. In both the trial court and on appeal, Zuniga has

24

argued statements he made during the interrogation that resulted from police coercion were inadmissible.

The Attorney General also contends Zuniga forfeited his claim because he did not identify "in his motion in limine the specific statements the defense sought to exclude at trial." Again, we disagree. The requirement of a timely objection (Evid. Code, § 353) is satisfied if the trial court is alerted "to the nature of the anticipated evidence and the basis on which exclusion is sought" and the prosecution is afforded "an opportunity to establish its admissibility." (*People v. Williams* (1988) 44 Cal.3d 883, 906.) All of these requirements were satisfied in this case. In their in limine motions, both parties alerted the court that the admissibility of Zuniga's statements was a contested issue. As the party seeking admission of Zuniga's statements, the burden was on the prosecution to establish they were voluntary and admissible. (*People v. Sanchez* (2019) 7 Cal.5th 14, 48.) At the evidentiary hearing, the prosecution presented evidence, testimony, and argument on this issue, while Zuniga's counsel argued for suppression of Zuniga's statements on the ground the officers' promises produced an involuntary confession. The court was fully apprised of the issue and the analysis needed to make an informed ruling. Nothing more was required to preserve the issue for appeal. (*People v. Partida* (2005) 37 Cal.4th 428, 435.)

B. *Applicable Legal Principles*

"Both the federal and state Constitutions bar prosecutors from introducing into evidence a defendant's involuntary statement to government officials. [Citation.] This prohibition bars the admission of an involuntary confession, as well as an involuntary admission. [Citation.]" (*People v. Battle* (2021) 11 Cal.5th 749, 790.) An incriminating statement "is involuntary if the ""influences brought to bear upon the accused were "such as to overbear [the defendant]'s will to resist and bring about confessions not freely self-determined."""" [Citation.] 'A confession [or admission] may be found involuntary if extracted by threats or violence, obtained by direct or implied

25

promises, or secured by the exertion of improper influence.' [Citation.]" (*People v. Wall* (2017) 3 Cal.5th 1048, 1065-1066 (*Wall*).) "In determining whether a [statement] is involuntary, we consider the totality of the circumstances to see if a defendant's choice to confess was not '"""essentially free"""' because his will was overborne by the coercive practices of his interrogator. [Citation.]" (*People v. Spencer* (2018) 5 Cal.5th 642, 672.)

In *Wall*, our Supreme Court explained: "'[W]here a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary and inadmissible as a matter of law.' [Citation.]" (*Wall, supra*, 3 Cal.5th at p. 1066.) "'"Although coercive police activity is a necessary predicate to establish an involuntary confession, it 'does not itself compel a finding that a resulting confession is involuntary.' [Citation.] The statement and the inducement must be causally linked. [Citation.]" [Citation].' [Citation.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1176 (*Linton*).)

"'Once a suspect has been properly advised of his rights, he may be questioned freely so long as the questioner does not threaten harm or falsely promise benefits. Questioning may include exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect. . . . Yet in carrying out their interrogations the police must avoid threats of punishment for the suspect's failure to admit or confess particular facts and must avoid false promises of leniency as a reward for admission or confession. . . . [The police] are authorized to interview suspects who have been advised of their rights, but they must conduct the interview without the undue pressure that amounts to coercion and without the dishonesty and trickery that amounts to false promise.' [Citation.]" (*People v. Holloway* (2004) 33 Cal.4th 96, 115 (*Holloway*).)

"'It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied. [Citations.] However, mere advice or exhortation by the police that it would be

better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. . . . Thus, "[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made. [Citation.] On the other hand, "if . . . the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible . . . ."' [Citations.]" (*Holloway, supra*, 33 Cal.4th at p. 115.) "'The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear.' [Citations.]" (*People v. Cahill* (1994) 22 Cal.App.4th 296, 312 (*Cahill*).)

"'On appeal, we conduct an independent review of the trial court's legal determination' as to the voluntariness of a confession. [Citation.]" (*Wall, supra*, 3 Cal.5th at p. 1066.) "[W]e rely on the trial court's factual findings to the extent they are supported by substantial evidence . . . ." (*Ibid.*) But "where, as here, '[t]he facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded,' those facts as well as the ultimate legal question are 'subject to our independent review.' [Citation.]" (*Ibid.*) The prosecution bears the burden of proving by a preponderance of the evidence the voluntariness of a defendant's statements to the police. (*Ibid.*)

Independently reviewing the matter, we conclude the officers made coercive statements at multiple points in the interview by making promises of leniency if Zuniga confessed and threats of greater punishment if he did not. We further conclude the officers' conduct was the motivating factor of Zuniga's decision to make inculpatory statements in the interview's third segment.

27

C. *Analysis*

Recognizing the difference between a promise of leniency and a statement of fact can be difficult as the difference is subtle. (*People v. Thompson* (1990) 50 Cal.3d 134, 169.) "The line 'can be a fine one' [citation] between urging a suspect to tell the truth by factually outlining the benefits that may flow from confessing, which is permissible, and impliedly promising lenient treatment in exchange for a confession, which is not." (*Holloway, supra*, 33 Cal.4th at p. 117.) Viewing Zuniga's interview in its entirety, we conclude the officers crossed this line, repeatedly.

At the hearing on the admissibility of Zuniga's statements, the officers candidly admitted they said inappropriate things and made promises they should not have during the interrogation. In arguing for the admission of Zuniga's statements, the prosecutor explicitly stated he was not taking "the position that the officers were appropriate" during their questioning of Zuniga. He conceded "that what [the officers] did was at times improper." However, the Attorney General has taken a different stance on appeal, asserting the officers did not make express or clearly implied threats or promises to Zuniga, and therefore, the officers said nothing improper during the interview. We disagree.[11]

Some of the officers' most troubling statements occurred during the interview's second segment. One of the first promises of leniency came when Garcia told Zuniga that if he confessed and wrote an apology letter, he "could be out on bail and never see jail time . . . ." Garcia then followed up this comment by telling Zuniga he was facing a single felony count that could be "dropped down to a misdemeanor if . . . given your record, given you have no history, given that it was, uh, 'My mistake . . . [¶] . . . and I apologize.'" Another occurred near the end of the interview's second segment where

---

[11]     Given the officers' admissions at the hearing and the prosecution's stance below, we were dismayed to read the Attorney General's position on appeal. It is baffling.

28

Garcia told Zuniga: "And like I said, I would hate for you to go to jail for several years for something that you could have not just . . . put it on the table . . . and say, 'You know what? I fucked up. I'm sorry.' . . . Done with already . . . you could have just done minimal time. I mean, even . . . not even go to jail. You can stay out on probation . . . be on probation and be out on bail, and not get in trouble and still provide for your family and work and do what you have to do, okay?"

The officers also made express and clearly implied threats. Aranda told Zuniga that if he stuck with his story that he innocently touched Jane while looking for his son, his case would get caught up in the media and his face would be "plastered all over the media" and Facebook. Garcia tied some of his threats to the DNA ruse, warning Zuniga that if he stuck with his story and the DNA evidence came back against him, the judge would probably add another charge; he would serve years in prison, leaving his family to struggle without him; and he would "do the max time . . . and that's several years" and have to annually register as a sex offender.

In the interview's third segment, the officers made more promises of leniency. After Zuniga stated he was "not familiar with the court system," Garcia told Zuniga that his attorney could work out a plea deal with the district attorney's office if he admitted he "'messed up'" and Garcia explained "they look at your record, . . . . uh, probation for three years. It's done with already. Stay out of trouble. Don't do it again." Garcia later tried to walk back this comment, telling Zuniga that he was not promising him anything but that it would "go better [for him] in court" and Zuniga maybe could "go out to some plea deal" if he confessed. But a minute or two later, Garcia advised Zuniga that if he told them "what happened," he could handle the case through a plea deal and with a good attorney get a "less charge and less time, maybe even probation, get out on bail." After Zuniga admitted it was a "possibility" the incident happened, but he could not remember because he was intoxicated, Garcia told him that he probably could not

29

help him with "this probability thing" and that he needed to admit he did it. Zuniga stated he would "admit to it happening" if that is what they wanted him to say.

The interplay of the officers' promises of leniency and threats created a coherent theme—if Zuniga admitted he did it and wrote an apology letter, the charge could be reduced to a misdemeanor, he could get out on bail, receive probation, and not do jail time, but if he did not, he would serve the maximum sentence, leaving his family to suffer, and his face would be plastered all over the news and social media. Contrary to the Attorney General's contention, the officers did more than merely point out the benefit that """"flows naturally from a truthful and honest course of conduct."""" (*Holloway, supra*, 33 Cal.4th at p. 115.) The officers were not simply describing the possible consequences of a conviction, which is permissible. (*Ibid.*)

The clear import of the officers' statements was if Zuniga told them the truth as they viewed it and wrote an apology letter, he would receive more lenient treatment. They did not offer vague statements about how his confession might help him, instead, they told him specifically that the charge could be reduced to a misdemeanor, he could bail out, get probation, serve minimal time, and continue providing for his family. (Cf. *People v. Carrington* (2009) 47 Cal.4th 145, 174 [officers' statements "simply informed defendant that full cooperation might be beneficial in an unspecified way"].) Not only did they specify how his confession would help, they also specified how his continued denial would hurt him, his case, and his family. (Cf. *Ibid.* [officers' statements "did not threaten defendant and did not specify how her continued denial of criminal involvement could jeopardize her case].) Nor can the officers' transgressions be excused as a "brief and isolated exchange" as they occurred repeatedly throughout the interview. (Cf. *People v. Jones* (2017) 7 Cal.App.5th 787, 813 [concluding detective's isolated comment defendant "would only 'do a little time in camp'" if he confessed was not the proximate cause of defendant's admissions].)

30

When we analyze the interview as a whole, we find more troubling aspects. Beginning early in the interview's first segment, the officers suggested Zuniga may have been drunk at the time the incident occurred and unaware of his actions. This is a common interview tactic, where officers suggest a possible explanation and offer the defendant an opportunity to provide details, and is generally permissible. (*People v. Carrington, supra*, 47 Cal.4th at p. 171.) But the problem here is the frequency with which the officers deployed this tactic—more than eight times in the interview's first two segments—and how they welded it to their promises of leniency. The reoccurring theme the officers presented in the first two segments was for Zuniga to admit he was drunk and made a mistake, apologize for it, and he would get out on bail, receive probation, and might not even go to jail.[12]

Having concluded the officers engaged in coercive conduct, we must consider whether this conduct was a "'motivating cause'" of Zuniga's admissions. (*Wall, supra*, 3 Cal.5th at p. 1066.) Had Zuniga confessed immediately after the officers' promises and threats, it would be undeniable he was relying on them. (*Linton, supra*, 56 Cal.4th at p. 1177.) "Where the dominant focus of an interrogation is an implied promise of leniency and a confession ensues, absent adduction of countervailing evidence, e.g., a substantial time lapse between the implied promise and the incriminating statements, the confession must be attributed to that implied promise." (*Cahill, supra*, 22 Cal.App.4th at p. 316.) Here, the promises of leniency offered by the officers, specifically Garcia, were a dominant focus of the interrogation. Zuniga was repeatedly told he could get out on bail, receive probation or minimal jail time if he just admitted he committed the crime

---

[12]     Although not coercive statements, we are nonetheless troubled by some of Garcia's statements to Zuniga regarding his constitutional rights. Garcia misstated the presumption of innocence, falsely telling Zuniga that his attorney would have to prove him innocent. He also advised Zuniga to waive his right to a jury trial, forgo his right to confrontation, and take any deal his attorney works out because it would be unfair to Jane to force her to take the stand and be subjected to cross-examination.

and apologized. Nor was there a significant lapse in time between the officers' promises of leniency and Zuniga's admissions in the interview's third segment—only the hour in which Zuniga was left in the holding cell. During this time, Zuniga realized his denials were ineffective and he was going to have to give the officers what they wanted so he could get the leniency they told him about.

The circumstances in this case remove any doubt the officers' promises and threats were a motivating cause of Zuniga's admissions in the third segment. At the beginning of the interview's third segment, Garcia asked Zuniga to confirm he was not being promised anything or forced "to provide a statement that's not gonna be true." Zuniga responded only that he was not being forced. Zuniga's failure to confirm he was not promised anything reflects his understanding he had in fact been promised leniency if he conformed his statement to what the officers wanted.

During the interview's third segment, Garcia told Zuniga: "This is where you're going. 'I was drunk. I made a mistake. I'm sorry.'" And that is exactly where Zuniga went. Zuniga tried to follow the theme laid out by the officers and said he was drunk at the time of the incident and in the past he had done things he did not recall so it was possible the incident occurred. At times, he sought clarification from the officers as to exactly what they wanted him to say. At the end of the interview's third segment, after giving the officers everything he thought they wanted, Zuniga asked if he could get out on bail as they talked about earlier.

When ruling on the admissibility of Zuniga's statements, the trial court indicated it began "to have concerns about the reliability and voluntariness" of Zuniga's statements early in the interview's third segment. After conducting our de novo review, we share these concerns. We conclude the court should have suppressed not only Zuniga's statements agreeing with Garcia's version of the incident but also his admissions that he was drunk, made a mistake, and did not recall everything that happened so it was possible the incident occurred.

32

D. *Prejudice*

We now turn to the issue of whether the error was harmless beyond a reasonable doubt. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 306-312; *Chapman v. California* (1967) 386 U.S. 18, 24.) This standard requires the Attorney General "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman, supra*, 386 U.S. at p. 24.) "'To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.]" (*People v. Neal* (2003) 31 Cal.4th 63, 86.) Under this test, the Attorney General has a steep but surmountable climb to convince us the admission of Zuniga's incriminating statements was harmless beyond a reasonable doubt. The Attorney General endeavors to meet this challenge, but his effort falls short.

At trial, it was undisputed Zuniga touched Jane. The contested issues were where he touched her and his intent in doing so. On these issues, Jane's testimony was credible and compelling. Moreover, her conduct in the minutes and hours after the incident corroborated her allegation. This evidence alone was sufficient to support the jury's verdict. But the evidence of Zuniga's guilt was not so overwhelming or conclusive that we can say the erroneous introduction of his incriminating statements was harmless beyond a reasonable doubt.

We cannot help but question whether the admission of Zuniga's incriminating statements contributed to the verdict against him as the jury in his first trial, which did not hear this evidence, was unable to reach a verdict and hung six-six. (See *People v. Diaz* (2014) 227 Cal.App.4th 362, 385 [previous trial resulting in a hung jury supports a finding of prejudice where the evidence presented at both trials was similar, except the challenged evidence was not presented at the first trial].) We acknowledge there were differences in the evidence before the two juries, as pointed out by the

33

Attorney General. Thus, we place limited weight on this fact and do not rely on it exclusively in concluding the error was prejudicial.

We place more weight on the prosecutor's reliance on Zuniga's incriminating statements. (*People v. Diaz, supra*, 227 Cal.App.4th at p. 384 [prosecutor's repeated references in closing argument to evidence that should have been excluded "increases the potential for prejudice flowing from the error"].) The prosecutor used Zuniga's admissions—it was possible the incident occurred; he was drunk; and he does things he does not remember when he is drunk—to both corroborate Jane's testimony and to attack Zuniga's trial testimony. The prosecutor's theory of the case, as he explained it to the jury, was that Zuniga "molested Jane Doe and he doesn't remember" it because he was drunk. During closing and rebuttal arguments, the prosecutor supported this theory by replaying portions of Zuniga's admissions six times, demonstrating they were a prominent part of the prosecution's case. Indeed, this was the only substantial attack the prosecutor waged on Zuniga's credibility and testimony.

In closing argument, both parties argued the case boiled down to credibility. The prosecutor repeatedly used the incriminating statements Zuniga made in the third segment of the interview to attack Zuniga's credibility. The prosecutor had little else to use as minutes after the incident, Zuniga had offered a plausible explanation for why he was in Jane's room and he maintained this story throughout the interview's first two segments and in his trial testimony. On this record, we cannot say Zuniga's incriminating statements were "'unimportant in relation to everything else the jury considered on the issue'" of how Zuniga touched Jane. (*People v. Neal, supra*, 31 Cal.4th at p. 86.) We conclude the admission of statements Zuniga made in the interview's third segment was prejudicial error.

34

DISPOSITION

The judgment is reversed and the matter is remanded to the trial court.


O'LEARY, P. J.

WE CONCUR:


THOMPSON, J.


GOETHALS, J.